**BUTLER v. STATE.**
No. A–11929.

Criminal Court of Appeals of Oklahoma.

March 24, 1954.

Rehearing Denied May 12, 1954.

S. S. Lawrence, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Lewis J. Bicking, County Atty., Tulsa County, Tulsa, for defendant in error.

POWELL, Presiding Judge.

Raymond F. Butler, plaintiff in error, hereinafter referred to as defendant, was charged by information filed in the district court of Tulsa County with the crime of murder, was tried before a jury, found guilty and his punishment assessed at life imprisonment in the State Penitentiary. Appeal was perfected to this court on April 29, 1953, but no brief in support of the petition in error has ever been filed. When the case came on for oral argument on September 30, 1953, counsel for the defendant waived argument and announced that it was agreeable that the case be submitted on the record.

This court has repeatedly held that under circumstances as recited this court is required to search the record only for fundamental error and if none found, the case would be affirmed. Fitzgerald v. State, 77 Okl.Cr. 409, 142 P.2d 131; Lombness v. State, Okl.Cr.App., 243 P.2d 389. Nevertheless, the punishment on a determination of one being guilty of the charge of murder is either death or imprisonment at hard labor in the State Penitentiary for life. Tit. 21 O.S.1951 § 707. We have therefore not only examined the information, the instructions to the jury and proceedings generally, but have particularly examined the evidence of some twenty-four witnesses for the State and the evidence of the accused, who offered no testimony but that of himself, where he denied the killing and interposed testimony in the nature of an alibi. The court submitted to the jury a correct instruction covering circumstantial evidence and the defense known in law as an alibi. The instructions properly covered the defendant's theory of his defense as testified to by him.

While there was no eye witness to the killing, the evidence developed that the deceased, Iola Jackson, was a comparatively young colored woman with two children, one 13 years of age and one 9 years of age. The deceased was not living with her husband, but had been working at a cafe owned and operated by the defendant at 615 Queen, in Tulsa. There was a bedroom attached and Pauline Jackson, the older daughter of deceased, testified that her mother had been living there with the defendant for a year; that she heard the defendant tell her mother on at least nine occasions that he would kill her if she ever left him. She had threatened to leave. The defendant was married and maintained a home at 558 Reading Street, Tulsa.

The evidence disclosed that the deceased did leave the defendant on May 12, 1952, while the defendant was absent 'paying bills. This was on Monday. She went to a friend's home to hide and expressed fear that the defendant would kill her. During the night she moved to 322½ North Frankfort Place, where her sister lived. She told others of her fear of defendant.

The evidence developed that on May 19, 1952, Arthur Holmes, a grocer, sold to the defendant a pawn ticket on Dick Bardon's pawn shop, 109–11 South Main, Tulsa, for $9, covering a .38 Smith & Wesson pistol. He had offered to sell the pistol to the defendant prior to the time he pawned it. The pistol was redeemed from the pawn shop the day of the night Iola Jackson was killed, and the pawn ticket was identified by both Harold Brown, an employee at the Bardon pawn shop, and by Arthur Holmes. The redemption charges were $26. The murder took place on the night of May 20, 1952, at 322½ North Frankfort Place.

Annabelle Mvrick testified that she lived at 1621 North Greenwood Place and that the defendant came to her place around 9:30 o'clock the night of May 20, 1952; that her husband was in bed asleep, but that she was awake and that the defendant knocked on their door and said that he wanted to talk to her about Iola. She testified:

"I told him all right, and he said, 'I am going to kill her.' I said, 'Raymond, don't kill Iola.' He said, 'Yes, I am going to kill her.' I said, 'Don't kill Iola', and I said, 'You mean to say you are going to kill this woman, when she has two little girls?' He said, 'Damn those girls.' He said, 'You will see, I will kill that woman.' He said, 'I am going to kill her.' I said, 'Don't kill that woman. Think of those kids,' and he commenced again, he said, 'I am going to kill her,' and I kept pleading and begging him not to kill her. He said, 'Well, the only reason I don't kill her is because this gun won't fire', and he pulled out a gun and there was just a screen between us * * *

"The Court: I didn't hear you.

"A. He said the only reason he wouldn't kill her, this gun wouldn't fire."

Witness further stated that the weapon was a pistol but that she did not know the make. Defendant also had a flash light.

Ira Fowler, driver for the "Your Cab" company testified that he had known the defendant for about 25 years; that at about 11 to 11:30 the night of the killing he received a call when he was in the Greenwood and Pine area from his dispatcher's office to go to 558 Reading (shown to be the home place of defendant) for a passenger. That he put his spot light on the number, and his passenger came out and that he recognized the defendant as he got in the cab. Witness was directed to stop at 315 North Hartford, and the defendant Butler got out and went to the house, and came back in three or four minutes and said: "Drive me around to Frankfort." He drove almost over to Frankfort and the defendant asked him to turn up an alley (shown to be

the alley where Iola Jackson's body was later found and where a .38 calibre Smith & Wesson pistol was found in an incinerator) and defendant got out. Witness stated that defendant asked him to wait, but he had already told defendant he was in a hurry, so that after defendant left his cab he drove away. The driver claimed that he had to make arrangements to get away to Kansas for the funeral of a relative. He stated that when he got up to Frankfort he heard a report like a backfire, three or four reports, but that he did not pay any attention to it.

There was much other corroborative evidence that Iola Jackson was afraid of the defendant, that he had threatened to kill her if she left him, and that he had hunted for her after the 12th of May, when she left him.

The evidence developed that the deceased and one Johnnie Williams, who lived at 347 North Greenwood, on the night of May 20, 1952, at around 11 o'clock purchased some barbecue and went where she was staying at 322½ North Frankfort Place; that he ate the sandwich and Iola said she believed she would go get some more barbecue and while she was gone Williams undressed and fell asleep and never did know when she returned. There were two bed rooms with a front door out of one. He was in the front room. He stated that he was awakened by someone kicking in the door, and he saw a flash and heard a shot, and witness jumped out the front door and ran away in his shorts and shod only in his socks. He heard two more shots as he dashed away. Iola Jackson was found, dressed only in a slip, to the rear of the house, trapped by a chicken wire fence, with a bullet from a .38 calibre pistol that entered her forehead and lodged under the skin near her left ear. Also a bullet entering the shoulder. One bullet was found to have hit a lock on the door between the two rooms. The wire fence at the rear had been ripped through sufficiently to permit egress of a person. A .38 calibre pistol was found down the alley in an incinerator the next day, and was identified by Arthur Holmes as the pistol pawned at Bardon's

and that the pawn ticket he sold defendant was for the redemption of that pistol.

The taxi-cab dispatcher corroborated getting the call for the taxi from 558 Reading and dispatching Ira Fowler there. The cab call ticket made out as a record by the dispatcher was received in evidence. The call was at 11:01 at night, May 20, 1952.

The defendant testified and claimed that the State's witnesses were testifying falsely, pointing out that when the officers arrested him around 2:30 the night of the killing that he was asleep in the bedroom of his restaurant, and claimed that he had not been away from there that night. He claimed that many customers coming by that night could establish a complete alibi for him.

It developed that the defendant only subpoenaed his witnesses the day before his trial, and the officers could only find one of them, and defendant did not use him. He indicated that his attorney did not get out the subpoenas promptly, that he had advised him the names of his witnesses earlier but did not give him a written list until the day before trial. The court adjourned the trial until the next day, after defendant testified, and stated both the State and the defendant would thus be given further opportunity to produce additional witnesses. The State produced one of the main persons defendant had claimed would testify that he was in his cafe near the time of the killing, a Mrs. Daisy Felton. She admitted having known the defendant well, but denied having been in his place of business in almost two years and denied having seen him prior to right then in almost two years.

Some of the witnesses the officers attempted to find for defendant were reported as not having been seen at the addresses given in years. Thus it would appear that the court did not err in forcing the trial. Defendant had a preliminary, and though he discharged his first attorney, he employed experienced counsel ten days or more prior to his trial. Counsel appears to have done his best for the defendant. The sentence could have been death. The

sentence imposed was as light as the law allows on a finding of guilty for murder.

The verdict and judgment of the district court of Tulsa County is affirmed.

JONES and BRETT, JJ., concur.